# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 10 CR 0096-4 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| TERRANCE JONES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On May 13, 2011, a jury convicted defendant Terrance Jones of possession with intent to distribute more than 50 grams of crack cocaine and of using a telephone to commit a narcotics trafficking crime. Jones filed both a motion for judgment of acquittal and a motion for a new trial, arguing *inter alia* that the evidence was insufficient to sustain his conviction. While the court initially denied both motions, it reexamined the sufficiency of the evidence in ruling upon a subsequent post-trial motion. The court requested oral argument, which took place in November 2011. Because the court agrees that the evidence at trial was insufficient to prove Jones guilty of the charged offenses beyond a reasonable doubt, the court grants the motion for a judgment of acquittal.

## I. BACKGROUND

On February 8, 2010 the government filed a complaint detailing the existence of a drug trafficking operation run by Dominique Finley, a high-ranking member of the Four Corner Hustlers street gang. According to the complaint, Finley and his associates began operating on the west side of Chicago in 2008. Finley was responsible for running several drugs spots and supplying wholesale quantities of crack cocaine to other individuals. Finley purportedly made use of Terrance Jones, Clarence Johnson, and

Milton Bills to convert powder cocaine into crack cocaine; Eric Ollison to transport and deliver drugs or money; and Frederick Taylor to sell the drugs to others.

Law enforcement agents began investigating Finley's organization, making use of confidential informants, surveillance, and Title III wiretaps. As a result of that investigation, Finley, Bills, and Jones were arrested on February 9, 2010, followed by the arrests of Taylor and Ollison. Count I of the superseding indictment charged Finley, Bills, Ollison, and another individual (Kelvin Green) with conspiracy to possess and intent to distribute more than 50 grams of narcotics. Jones is not named as part of the conspiracy; instead, the counts brought against him all related to specific events that unfolded on June 17, 2009.

Briefly—these facts will be discussed in detail below—on that day the Federal Bureau of Investigation ("FBI") and the Chicago Police Department ("CPD") were working together to monitor the activities of Finley and his associates. They had a wiretap on Finley's telephone, which was capable of making normal telephone calls as well as "push-to-talk" ("PTT") communications. CPD Officer Pacino tailed Finley's automobile for most of the day, while Agent Duda used a confidential informant to attempt a controlled purchase of crack cocaine from Frederick Taylor. Agent Duda placed an audio recording/transmitting device on the informant and provided him with money to make the purchase. The informant approached Taylor and spent some period of time with him before Finley showed up. Finley briefly spoke with Taylor, and then Taylor returned to the informant. The audio from the subsequent conversation between Taylor and the informant indicated that Finley had a kilogram of cocaine, but that it had

not yet been converted (or "cooked") into crack cocaine. Taylor returned the informant's funds, and the informant dutifully reported back to Agent Duda.

Following his meeting with Taylor, Finley met with a number of other individuals, including Jones. At around 7:00 p.m., CPD officers attempted to execute an enforcement stop on Finley and Jones while they were together in Finley's vehicle. During the ensuing car chase, two officers observed Finley toss a bag from the driver's side window into an alley. Moments later, Finley stopped the vehicle and took off running; Jones stayed put. Neither was arrested at the time, although Officer Hladik recovered 86.8 grams of crack cocaine, which Finley had thrown from the window. Neither Finley nor Jones noticed that the crack cocaine was recovered by the CPD, because later wiretap recordings established that Finley asked Jones return to the area to conduct an unsuccessful search for the drugs.

It is this crack cocaine, recovered on June 17, 2009, that is at issue. Jones was eventually arrested, and the superseding indictment charged him with two counts of using a telephone to commit narcotics trafficking crimes (based on PTT call # 5881, which took place at 2:00 p.m., and PTT call # 5646, which took place at 9:07 p.m.[1]) and one count of possession with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 843(b). Everyone else charged in the indictment—Finley, Taylor, Green, Ollison, and Bills—pleaded guilty,[2] but Jones proceeded to trial.

At trial, the government introduced testimony from Agent Duda and CPD Officers Pacino, Conneely and Hladik. In addition, the government called as witnesses

---

[1] The count based on PTT call # 5646 was dismissed upon the government's motion, and no evidence of that call was introduced at trial.

[2] Clarence Johnson pleaded guilty in a related case arising out of his association with Finley. *See* United States v. Johnson, No. 10 CR 0097 (N.D. Ill. filed Feb. 8, 2010).

Clarence Johnson and Eric Ollison, both of whom received lower sentence recommendations from the government in exchange for their cooperation; Agent Riordan, who served as the administrative agent on the wiretap investigation; Agent Culloton, who testified as an expert in crack cocaine trafficking; Jeremy Wintz, a forensic fingerprint examiner; and Peter Ausili, a forensic chemist. The government also played audio recordings of calls made to and from Finley's phone, starting at about 2:00 p.m. that day (PTT call # 5881) and ending at about 11:31 p.m. (PTT call # 6027). Jones did not testify or put on any witnesses.

The government's general theory of the case was that Finley needed to convert his raw cocaine into crack cocaine so that Taylor could sell the product to the informant. According to the government, Finley reached out to Jones because Finley's normal cooker, Clarence Johnson, was not available. The government claimed that Jones helped Finley obtain the diluents and equipment needed to convert the raw cocaine into crack cocaine; the two then met inside a residence at 1447 South Christiana for an hour and a half. Because Finley was in possession of crack cocaine after they left the house, the government asked the jury to infer that Jones obtained the necessary supplies (*i.e.*, the ingredients and a blender), then cooked the crack cocaine inside the house at South Christiana for Finley:

> [A]t 3:24 p.m., the defendant had a series of phone conversations with Finley that give us a window into what he and Finley were doing at that time. "I'm taking you where you want to go, man. I'm handling this." Those are the defendant's words. What is the defendant handling for Finley, ladies and gentlemen? The defendant is assuring Finley that he'll get his crack cooked for him. And what is it that Finley want[s] from Walgreens? Agent Culloton told you that drug dealers dilute the cocaine that they sell with all sorts of other substances, substances that you can buy from places like Walgreens. The next call continues the conversation.

Finley tells the defendant: "I'm trying to find some."  He's trying to get the defendant what he needs to sell the crack.

**\*\*\*\***

Later that day at 5:24 p.m. the defendant talks to Finley about something else he needs to cook the crack cocaine.  A blender.  You can see the call up there, and you can read it in your jury books.  And it's clear from that call they really need the blender, ladies and gentlemen. The defendant has a blender, but he needs the pieces.  He tries to get the blender from Finley's girl.  Then he tries to get the blender from his cousin.  He really needed that blender.  And ladies and gentlemen, you can tell from the context of this conversation what the defendant needed a blender for.  He wasn't blending margaritas.  He wasn't making milk shakes.  He needed a blender so he could cook crack cocaine for Finley.

Agent Culloton testified that a blender is used in processing cocaine powder into crack cocaine to mix the cut so you can stretch the cocaine.  And Lakefront, Clarence Johnson, told you that when you cook crack a hand blender or mixer is sometimes used to beat the substance while it hardens as it's being cooked.  And that's why the defendant needed a blender so badly. It wasn't for a party.  It wasn't to make a margarita.  It was for business.

**\*\*\*\***

What were Finley and the defendant doing in that residence for 90 minutes?  Well, let's use some good old-fashioned common sense.  Finley was a drug dealer.  He had powder cocaine he needed cooked into crack.  He had gotten a scale to weigh the cocaine.  He got a blender.  He got the stuff from Wal-Mart.  And he's inside the defendant's residence with him for 90 minutes.  And what happens at the end of the 90 minutes?  They emerge from that residence with this crack cocaine on Finley.  This crack cocaine which Finley tossed out the window.  It's clear what happened inside that house, ladies and gentlemen.  The defendant, Terrance Jones, cooked that crack cocaine, and he gave it to Finley.

(Trial Tr. 140:3-20, 141:21-142:14, 143:4-16, May 12, 2011.)

After hearing the evidence and arguments presented at trial, the jury returned a verdict of guilty on both counts.  Thereafter, Jones filed both a motion for judgment of acquittal and a motion for a new trial.  The court denied these motions, and Jones then filed a second motion for a new trial based on newly discovered evidence, which the

court also denied. In determining whether this newly discovered evidence warranted a new trial, however, the court necessarily reviewed all of the evidence introduced at trial. In light of that review, the court reconsidered its earlier ruling on the motion for a judgment of acquittal, and asked the parties to address the issue at oral argument. As the motion itself was timely made, the court concludes that it has the ability to revisit its initial ruling. *See United States v. Reed*, 375 F.3d 340, 342 (5th Cir. 2004) (affirming a district court that initially denied, then reconsidered and granted, a motion for judgment of acquittal); *see also United States v. Byrne*, 203 F.3d 671, 675 (9th Cir. 2000) ("[N]othing in the [1994] amended rule or notes explicitly precludes a district court from reconsidering a Rule 29 acquittal."). Thus, the matter is now ripe for a resolution.

## II. LEGAL STANDARD

In evaluating a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, the court views the evidence and the facts in the light most favorable to the non-moving party—here, the government. *See United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011) (citing *United States v. Jones*, 222 F.3d 349, 351 (7th Cir. 2000)). The court is not tasked with determining whether a particular defendant is actually guilty; the only question is whether, based upon the evidence presented, a rational jury could believe that the defendant was guilty beyond a reasonable doubt. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009). For this reason, "[a] defendant attacking the sufficiency of the evidence used to convict him faces a nearly insurmountable hurdle." *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009) (quoting *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995) (internal quotation marks omitted)).

Circumstantial evidence alone may suffice, but "each link in the chain of inferences the jury constructed [must be] sufficiently strong to avoid a lapse into speculation." *Moore*, 572 F.3d at 337 (quoting *United States v. Jones*, 371 F.3d 363, 366 (7th Cir. 2004)) (internal quotation marks omitted); *see Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001) ("Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation."). Where a court concludes that the evidence at trial was not sufficient to sustain a conviction, such a finding "is akin to an acquittal and bars the defendant's retrial under the Double Jeopardy Clause." *United States v. Rogers*, 387 F.3d 925, 935 (7th Cir. 2004) (citing *Burks v. United States*, 437 U.S. 1, 18 (1978) and *United States v. Lanzotti*, 90 F.3d 1217, 1220-24 (7th Cir. 1996)).

## III. ANALYSIS

The court must view the evidence in the light most favorable to the government. To do so, it is helpful to set out that evidence in a detailed timeline of the date in question.

At about 12:30 p.m., Agent Duda observed Frederick Taylor and unknown others on the corner of Mayfield Avenue and Thomas Street on the west side of Chicago. Agent Duda outfitted his confidential informant with an audio recording/transmitting device and gave the informant $1800 so that the informant could purchase crack cocaine from Frederick Taylor. The informant was instructed to approach Taylor on foot from a few blocks away. After sending the informant to make the purchase, Agent Duda entered a surveillance van and drove to a vantage point where he could observe and videotape the action on the corner.

The informant approached Taylor at about 1:30 p.m., and continued to meet with him for "several hours." Taylor briefly left the group on the corner at about 2:30 p.m., when Finley's car, a blue Infiniti G20, approached the area. Finley drove up to where Taylor was standing, and Taylor got in on the passenger side of the vehicle. Finley then drove his car about half a block forward and parked on the side of the road.

A short time later, Taylor exited Finley's vehicle, returned to the corner, and spoke with the informant. Two recordings from the discussion between Taylor and the informant were introduced at trial. At 2:33 p.m., the informant asked if "he (presumably Finley) got a brick on him?" to which Taylor responded, "but it's raw."[3] Taylor indicated that it would take Finley about thirty minutes to an hour, and the informant complained that Finley would not be able cook the brick in thirty minutes. A few minutes later, at 2:38 p.m., the informant asked Taylor why Finley was riding around with a brick, and Taylor answered that Finley "just bumped up with his connect."[4] No narcotics purchase took place at that time; instead, Taylor returned the informant's money. Agent Duda testified neither he nor anyone else was able to see inside Finley's vehicle, but based upon what he observed, he expected Finley to process the powder cocaine into crack cocaine, then return to Taylor and provide the crack cocaine for sale to the informant.

While all of this was happening, Finley's phone was being tapped. About half an hour prior to Finley's meeting with Taylor, he had spoken with Jones. In a 2:00 p.m. call, Finley said that he needed Jones and would come to where Jones was located, on West Concord Place. According to the government transcription of PTT call # 5881 (which

---

[3]     Agent Culloton testified in his capacity as an expert witness that the term "brick" refers to a kilogram of cocaine, while the term "raw" refers to cocaine that is uncut and in its powder form—in other words, the cocaine has not yet been converted into crack cocaine.

[4]     Agent Culloton testified that this phrase meant Finley had "met with his supplier, his connect or connection for narcotics."

forms the basis for one of the charges against Jones), Finley needed Jones "to do what [Jones had] done for Sonny" for him.

Finley was being tailed that day by Officer Pacino. Officer Pacino set up surveillance at the corner of Concord and Cicero Avenue. At around 2:20 p.m.,[5] Officer Pacino saw Finley's blue Infiniti parked on the side of the street; Finley was inside, talking to a person leaning into the car from the passenger side. Officer Pacino initially could not make out that person's identity, but after driving by once again he observed that it was Terrance Jones, wearing a red hat and a white t-shirt. Finley then drove away, and as already detailed, met up with Taylor at the corner of Mayfield and Thomas.

At 2:35 p.m.—just after Finley's meeting with Taylor—Finley spoke to Clarence Johnson via telephone and arranged an in-person meeting. According to Johnson's testimony, he had worked with Finley in the past to help him cook crack cocaine. Johnson's typical practice was to "crunch up" powder cocaine and to place it in a pot with some baking soda and water, then to cook it on a stovetop. He also testified that a blender could not be used in the process, but a hand mixer or a spoon would work to prevent the product from "locking up." Finley generally would give Johnson 63 grams of powder cocaine to convert at a time, and would instruct Johnson as to how much crack cocaine he wanted back (which would dictate the amount of baking soda Johnson used).

---

[5]      In closing argument, the government stated that this meeting took place at 2:22 p.m. However, Officer Pacino did not testify with this level of specificity at trial. His testimony on direct examination as to precise times was often vague, and only through the testimony elicited by Jones' counsel on cross-examination is the court able to pinpoint with any certainty when certain events took place.

The same issue arises in Officer Pacino's later testimony regarding the next meeting between Jones and Finley. At oral argument, the government said this meeting happened at 3:54 p.m., but on direct examination Officer Pacino testified only that the meeting occurred "probably a little over maybe an hour" after he had last seen Finley. Jones' counsel elicited on cross-examination that this second meeting occurred at around 3:52 p.m. The court proceeds with its analysis based on the evidence actually presented to the jury, viewed in the light most favorable to the government.

In any event, Finley and Johnson met up at Finley's grandmother's house shortly after the 2:35 p.m. call; Johnson testified that Finley asked him to cook. Johnson did not want the job, so he made the excuse of not having a pot in which to cook the crack cocaine and asked Finley whether he (Finley) had a pot. Finley did not have one, either, and Johnson left without having to cook.

At 2:45 p.m., Finley spoke with Eric Ollison on the phone, and said that he needed to "see that computer," which was a code word for a scale, "right quick." Ollison and Finley arranged to meet up "by the P," which Ollison understood to mean that they were to meet by a particular park. At the meeting, Ollison gave Finley the scale he had asked for.

About forty-five minutes later, Finley and Jones spoke via phone. At 3:24 p.m., Finley asked Jones where he could get "that" from, and suggested Walgreens; Jones responded by asking Finley whether he was ready, and said that he (Jones) would take Finley where Finley wanted to go, because Jones was handling it. Finley became frustrated by the lack of a straightforward answer, and Jones said that Walgreens did not have "it"; Finley then suggested CVS. The next part of the conversation was garbled, but on further questioning Jones stated that CVS "don't got 'em either." He said he was "fittin' to do it for [Finley]" and Finley could "go get it at Walmart." Finley again expressed frustration, and Jones responded in a 3:25 p.m. conversation that he was "tryin' to knock it out for [Finley]."

At 3:50 p.m., Finley called Clarence Johnson and asked whether Johnson was still around; Johnson responded that he was taking care of someone "on the other side," but he had not forgotten about Finley; he asked whether Finley had "found one." Johnson

testified that the "other side" language was Johnson's way of telling Finley that he was busy trying to sell someone some marijuana, and that by asking whether Finley had "found one," Johnson was asking whether Finley had obtained a pot. Finley responded that he had.

According to Officer Pacino, right around this time—that is, about an hour from the time Pacino last saw Finley, so around 3:52 p.m.[6]—Finley returned to the area of Cicero and Concord. Officer Pacino saw Finley pull his car into a parking lot by a liquor store. Jones approached and got into the car. The two drove off together, but Officer Pacino did not follow them. Officer Pacino noted that both a Wal-Mart and a Walgreens were located in this area, although there was no testimony that he actually observed either of them entering or exiting any drugstore.

At 4:06 p.m., Officer Pacino observed Finley's car parked in front of 5954 West Huron Street. Officer Pacino did not see Jones, but he did see Finley and another unidentified black man in the front yard. Officer Pacino saw the unidentified man holding a bag "sometime around th[at] time."

Officer Pacino picked up Finley's trail again at about 5:00 p.m. He saw Finley driving the blue Infiniti westbound down the south alley of Douglas Boulevard with Jones as a passenger. The next time he saw the car it was empty, parked on the corner of 15th and Christiana. About ten or fifteen minutes later, he saw a black man wearing a white tank top exit a home located at 1447 South Christiana.[7] Officer Pacino initially

---

[6]        *See supra* note 5.

[7]        In opening and closing argument, the parties stated that this was the defendant's residence, but the court can find no evidence to that effect in the transcripts. In addition, at oral argument the court asked the government about that address, and the government indicated that the home might be that of Jones' cousin.

could not make out the person's identity, although he later identified this person as Finley.

Starting at 5:13 p.m., a series of calls took place between Finley and Jones. Finley told Jones to go "pick [Finley's] girl up" at 16th and Ridgeway, and that she was going to walk to the corner. Jones confirmed that she was going to walk over there, and Finley responded that she was on her way, then repeated the instructions: "16th and Ridgeway." At 5:21 p.m., Jones indicated that he was right down the corner from Finley. Jones also seemed to indicate that he was with his female cousin at her house, and that they were looking for a blender. Jones said he was "right on the next block" from Finley, then asked Finley about his (Finley's) girl. Finley replied that he did not know whether she had a blender.

At 5:24 p.m., they spoke again. Finley reported that "she ain't got no blender," and Jones responded that he was still trying to get one from his other cousin. He told Finley, "I got this, just chill." Finley again grew frustrated with Jones, and said "you supposed to have all this, man. How you gonna come to me. Man, you ain't got nothin' here, man." Jones then said "I had the blender. I just didn't have the pieces. I didn't know that, 'cause I ain't did nothin'. You see, I got the blender. I thought I had the pieces."[8] Finley directed Jones to go "grab her first," because she was "sittin' right there on the corner." Jones replied, "That's all on your motherfuckin' mind. Money don't matter to you." Finley ended the call by saying that if he "knew all this" he would have "stayed where [he] was" because Jones "ain't got nothin' here."

---

[8]     The government did not offer any evidence as to what the reference to "pieces" meant. If Jones and Finley intended to refer to a hand-mixer—which according to Johnson can be used to cook crack cocaine, unlike a blender—the only "pieces" are the beaters, which are not typically transferable from one hand-mixer model to another. In short, the court can make little sense of this conversation.

At 5:28 p.m., Finley called Jones.  Jones reported that he was on his way to Finley's girl.  Finley confirmed that she was on the corner two blocks away, and Jones responded "M.O.B., man.  M.O.B."[9]  A minute later, Jones called Finley; he was at 16th and Ridgeway, but he could not see Finley's girl.  At 5:32 p.m., Finley called Jones again, asking him what he just said.  Jones replied "I'll holler at you," and Finley asked, "Did you get that?"  Jones said that it was "mandatory" and he "got that first."

About twenty minutes after Officer Pacino had seen the black man wearing a white tank top leave the house on South Christiana—so at about 5:30 or 5:45 p.m.—the same man, whom Officer Pacino now recognized as Finley, returned to the house.  Finley was with an unidentified black woman.  Both of them entered the residence.  Officer Pacino did not see them carrying anything into the home.  Within the hour, a Buick automobile pulled up and parked, and a second black female exited that vehicle.  Officer Pacino was not certain whether this woman actually entered the South Christiana residence or simply approached the front door, but she returned to the Buick quickly and drove away.

Finley called Eric Ollison at 6:20 p.m., and asked Ollison if "little man and them g[o]t up with you yet," which Ollison later testified meant that Finley was asking whether a certain person had paid a debt.  Ollison responded that he should have something in one minute, meaning that Ollison had talked to the guy that owed the debt.  Finley instructed Ollison that they should meet "by the P," or by the park, when Finley called back.

---

[9]        No evidence as to this term was introduced at trial, but for the edification of the reader, the court notes that according to the Urban Dictionary, M.O.B. is, *inter alia*, an acronym for the phrase "money over bitches."  *See* Urban Dictionary, M.O.B., http://www.urbandictionary.com/define.php?term=M.O.B. (last visited January 19, 2012).  Of course, like Wikipedia, the Urban Dictionary contains user-generated content and is not a definitive, or necessarily trustworthy, source. *See Kramer v. New York City Bd. of Educ.*, 715 F. Supp. 2d 335, 370 (E.D.N.Y. 2010) (noting that "online informal slang 'dictionaries' like Urban Dictionary" may be "of highly uneven quality, and may lead students to materials that are inaccurate, obscene, misogynistic, or simply pornographic, rather than to reliable, helpful explanations.").

Forty or fifty minutes after the Buick left the South Christiana home, at about 6:30 or 6:45 p.m., Officer Pacino observed Finley, the first female, and Jones get into Finley's car and drive southbound on Christiana toward 16th. This time, Officer Pacino followed them. He observed the car turn westbound on 16th toward Ridgeway. At that corner, Finley stopped the car and let the woman out. Officer Pacino continued to follow Jones and Finley as they got on Interstate 290 and exited in the area of Austin Boulevard.

At around 7:00 p.m., the planned traffic enforcement stop took place. Officer Conneely followed the blue Infiniti in his unmarked police car; Officer Hladik and his partner were doing the same thing in another unmarked vehicle. When the officers attempted the stop, Finley sped up and tried to evade the police. He drove up over a curb onto the sidewalk, then made an eastbound turn into an alley just south of Madison Avenue, at which point both officers observed Finley throw a clear plastic bag out of his window. The bag landed in an alleyway. Officer Hladik stopped his car to recover the drugs, while Officer Conneely continued the pursuit. After Officer Hladik secured the drugs, he rejoined the chase. Finley drove for awhile, then stopped the car and fled on foot. Officer Conneely chased Finley down and was able to place him in custody. Meanwhile, by the time Officer Hladik arrived at the scene, the Infiniti was "crashed up against the curb" with two flat tires. Jones was simply waiting by the side of the car, and did not attempt to flee. Neither Jones nor Finley was placed under arrest at that time; instead, they were both permitted to leave the scene so as to not compromise the covert nature of the ongoing investigation.

At 7:32 p.m., Finley instructed Ollison by phone to meet him at Madison and Austin "right quick" and to come alone. Ollison could tell something was wrong by

Finley's tone. Ollison parked the car as instructed by Finley and walked to a bus stop. Finley told Ollison what had happened: "the police had just chased him" and "he had to throw his shit." Ollison understood that to mean that Finley had to get rid of the crack cocaine. The next call between these two took place at 7:51 p.m. Ollison said he was "fittin' to come that way right now." Finley asked, "You gonna go back there and look?" to which Ollison responded, "What, through the alley?" Finley said yes, and Ollison complained that he did not know "what part it is," meaning he did not know where the crack cocaine was located, but then said that he was on his way.

A series of calls between Finley and Ollison starting at 7:57 p.m. show that Ollison was trying to catch up to Finley, and that Ollison was getting frustrated by Finley's constant relocations. At 8:00 p.m., Ollison says "goddamn, one place to the next, what the hell (unintelligible) just park, man." The next call, at 8:15 p.m., has Finley reporting to Ollison that "these bitches two cars deep, man, right here on Austin, man. Just sittin' right here with the lights on." Ollison later clarified that Finley was telling him the cops were still in the area where Finley had been stopped earlier in the day.

A minute later, Finley called Clarence Johnson. Like Ollison, Johnson could tell from Finley's voice that something was wrong. Johnson asked, "What happened? You messed it up?" Johnson testified that he was asking if Finley had messed up cooking the crack cocaine. Finley replied that he would tell Johnson what happened once Johnson came around. Johnson asked Finley if he needed to come now, but Finley said no, that he was cool.

At 8:18 p.m., Finley and Jones had two quick calls. Jones was with Ollison, looking for the crack cocaine Finley had thrown out of the window into the alley. In the

first, Finley asked whether "y'all found 'em?" Jones said, "Nah, we thought you did" and Finley responded, "Fuck no." In the second, Jones told Finley that he (Jones) and Ollison were "fittin' to double back."

Just after that, at 8:24 p.m., a conversation took place between Finley and Ollison. Ollison testified that Jones grabbed the phone from him about halfway through the call. The government transcribed the call, which is PTT # 5991, as follows:

> Finley: Yeah.
>
> Ollison: Where you at?
>
> Finley: Over here by the P.
>
> Ollison: By the P?
>
> Finley: Yeah.
>
> Jones: I, I think Homey and them weeped us, Joe. Remember we walked past Homey and them by the alley, 'cuz I just, we went back there and tore it up, Joe. And, we didn't give a fuck, Joe. You know what I'm saying? Homey done weeped us, Joe. 'Cuz they, where they hangin' at they could see a straight shot when we walked past them by the alley, I'm like, man, let's go this way. I think they weeped us, Joe. They had to, man, 'cuz they right there too deep. You know what I'm saying?
>
> Finley: Right, right. I think they peeped us too though on the real, 'cuz they was on that other block too.
>
> Jones: Right, right, yeah. They, they let their people know we just tore that motherfuckin' thing up, man. You know what I'm sayin'? That little bushes all that shit. You know big ass white bag ain't, ain't hard to miss, man.
>
> Finley: Come over here, I'm gonna tell y'all what's all over here.

Ollison and Jones could not find the bag containing the crack cocaine, and the last call played for the jury, which took place at 11:31 p.m., showed that Finley had some suspicions regarding Jones. Finley asked Ollison whether Ollison had seen "Big

Homey"—Jones—pick anything up in the alley. Ollison told Finley that he had not seen Jones grab anything, and that Jones had been in front of him the whole time.

That was the last event on June 17, 2009 for which the government introduced evidence at trial. In addition, the government established that the crack cocaine recovered by Officer Hladik was turned over to Agent Duda and the DEA for analysis. Forensic chemist Peter Ausili testified that the drugs recovered from the scene of the traffic stop consisted of 86.8 grams of crack cocaine which, according to Agent Culloton, constituted "hundreds" of individual user portions. The crack cocaine was packaged in a single clear bag; inside, different amounts of the crack cocaine were individually packaged in sizes ranging from 3 to more than 25 grams. Testing established that the cocaine base had an adulterant called PHIT (or phenyltetrahydroimidazothiazole), which is commonly used in veterinary medicine for de-worming, as well as sodium bicarbonate. The tested sample comprised 51.4% cocaine base.

The only physical evidence recovered was the crack cocaine itself; the investigating officers did not search the residence at South Christiana, conduct a trash pull, or search the inside of Finley's vehicle, because to do so would have compromised the covert nature of the investigation. In addition, Jeremy Wintz testified in his capacity as a forensic examiner that of the three latent fingerprints detected on the bag containing the crack cocaine, none matched Finley or Jones.

So the question becomes whether, based on the evidence detailed above, any reasonable jury could have found Jones guilty beyond a reasonable doubt. As both Jones and Finley are charged in Count Thirteen and Count Fifteen,[10] for the jury to find Jones

---

[10]     By agreement of the parties, on October 13, 2010, the superseding indictment was amended to correct a typographical error. Count Thirteen initially charged Finley and Jones with using a telephone to

guilty of Count Fifteen (the possession count), the government had to prove that Jones knowingly and intentionally possessed a controlled substance with intent to distribute it to another person. *See United States v. Campbell*, 534 F.3d 599, 604 n.3 (7th Cir. 2008) (citing *United States v. Banks*, 405 F.3d 559, 569 (7th Cir. 2005)). By contrast, to obtain a guilty verdict on Count Thirteen (the telephone facilitation count), the government had to prove that *either* Finley or Jones committed the underlying possession offense *and* that Jones knowingly and intentionally used the telephone to facilitate that possession. *See United States v. McGee*, 408 F.3d 966, 985 (7th Cir. 2005) ("[T]he government must prove the commission of the underlying offense to obtain a conviction on a charge of telephone facilitation.") (citation omitted); *United States v. Mueller*, 112 F.3d 277, 281-82 (7th Cir. 1997) ("[A] defendant cannot be convicted of using a telephone to facilitate a drug offense unless the defendant also aids or abets, or attempts to commit, the drug offense itself.").

For both of these counts, then, Jones' knowledge is critical. As the jury was instructed, Jones' knowledge could be proved by his conduct and all of the facts and circumstances surrounding the case. But as the jury was further instructed, any inference made had to be reasonable and based on the evidence. The court concludes that a jury could not return a guilty verdict without taking unsupported inferential leaps. While the government is certainly entitled to rely upon circumstantial evidence and to ask the jury to draw reasonable inferences, "each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski*, 256 F.3d at 693.

---

facilitate "the commission of a felony violation of Title 21, United States Code, Section 841(a)(1), namely, distribution of a controlled substance, as charged in Count Twelve." This made no sense, as Count Twelve was another facilitation charge. Pursuant to the agreed amendment, Count Thirteen was changed to reference Count Fifteen, namely, the June 17, 2009 possession charge against Jones and Finley.

A number of reasonable inferences can be drawn from the evidence at trial.  For instance, based upon the informant's conversations with Frederick Taylor and the surveillance of their meeting, it is perfectly reasonable to conclude that Finley had an uncooked kilogram of cocaine in his vehicle, and that Finley wished to convert that cocaine into crack cocaine to complete the sale to the informant.   It is also reasonable to infer that the cocaine remained uncooked as of 3:50 p.m., because at that time Finley reached out to Clarence Johnson—his usual cooker—via telephone for the second time.  Likewise, it is reasonable to infer that at some point during the day, Finley was able to cook (or have someone cook) the cocaine, as the CPD recovered crack cocaine during the enforcement stop.

But many inferences that have to be drawn to reach a guilty verdict are simply not supportable.  First and foremost, the government argued that the 2:00 p.m. phone call, in which Finley said to Jones "I need you to do what you done for Sonny for me," was the call that "got things rolling."   According to the government, in this phone call Finley asked Jones to cook crack cocaine for him.  However, there is absolutely no evidence in the record as to who Sonny is, nor is there any evidence that Jones had ever cooked crack cocaine for Finley, Sonny, or anyone else in the past.  (Indeed, at oral argument the government noted that it did not argue Jones had ever cooked crack cocaine for Finley prior to June 17, 2009, and neither Clarence Johnson nor Eric Ollison—other than Finley, the two people arguably in the best position to know—ever said that Jones had cooked for Finley in the past.)  Not only that, but this call took place at 2:00 p.m.—30 minutes *before* Finley reached out to Johnson, his usual cooker, and learned that Johnson was unavailable.  In light of this evidence, it is unreasonable to conclude that this 2:00 p.m.

phone call establishes that Finley asked Jones to cook crack cocaine. There is simply no basis for this inference.

Second, the government repeatedly stated that Finley and Jones were inside the house at 1447 South Christiana for 90 minutes. The evidence at trial established that this length of time was sufficient to cook the 86.8 grams of crack cocaine actually recovered, although it would not have been enough time to cook an entire kilogram of cocaine. The problem is that there is nothing to establish when Jones entered that house. Officer Pacino saw Finley's empty car parked outside at about 5:00 p.m., and he saw Finley exit, then re-enter, the building. However, he never saw Jones go inside. The only time he saw Jones during that entire period of time was when Jones, Finley, and the unidentified woman left the house just prior to the traffic stop.

In fact, while the government asked the jury to infer that Jones was inside cooking crack cocaine, the audio recordings introduced at trial provide strong evidence that for at least some period of time between 5:00 p.m. and 7:00 p.m. Jones was not in the house. In various calls around 5:30 p.m. Jones expressly stated that he was at his cousin's house (and there is no evidence as to whether this could mean the address at 1447 South Christiana or some other residence[11]), that he was on his way to get Finley's girlfriend, or that he was physically at 16th and Ridgeway looking for the girlfriend but could not see her. In short, there is nothing to establish the point in time at which Jones returned to the South Christiana home. And even assuming that it would be reasonable to infer that Jones was in the house long enough to cook the crack cocaine, there is no evidence that he did so. Not only that, but there is no evidence that Jones obtained any of the items that

---

[11]     As previously noted, no evidence at trial established who resided at 1447 South Christiana. *See supra* note 7.

the government claims he would need. He was never seen entering or exiting a drugstore, he was never seen carrying anything into or out of the South Christiana home, and no conversation established that he actually found a usable "blender" or any type of diluent.

Finally, in closing argument the government relied heavily on the conversation Jones had with Finley at 8:24 p.m., while Jones and Ollison were in the alley looking for the crack cocaine Finley had thrown out the window:

> He's speaking to Dominique Finley, and what does he say to him? "I think they weeped us, Joe." Does that say Finley, I think they stole it from you, whatever you dropped out of the car, which I don't really know what it is and I'm still looking for it? He says: "I think they weeped us, Joe." That was the defendant's bag. That was his money that he was interested in earlier in the afternoon. It was him that got ripped off. And it was him that was looking for his drugs in the middle of that alley. The defendant had an interest in those drugs, and that's why he went back. And ladies and gentlemen, that is why he was acting in the manner of someone who was looking for the very contraband that got dropped out of that car.

But while it is perfectly reasonable to infer that Jones knew what he was looking for in that alley—after all, Ollison knew—it is not reasonable to infer that Jones must have possessed or cooked the crack cocaine earlier in the day simply because Jones saw Finley throw the crack out of the car or because Jones searched for it later. The government places great emphasis on the phrase "weeped us," arguing that the use of this phrase establishes that Jones cooked the crack cocaine. However, there is no evidence as to what being "weeped" means. Frankly, the court suspects a mistranscription—in Finley's portion of the call, Finley agrees that "they peeped us,"[12]—but the point is simply that

---

[12]     According to Urban Dictionary, to "peep" something is to look at that object. *See* Urban Dictionary, Peep, http://www.urbandictionary.com/define.php?term=peep (last visited January 24, 2012). If the term was used in this sense, it would likely indicate that Jones believed someone saw Finley throw the crack cocaine out of his window while Finley and Jones were together in the vehicle.

this phrase cannot bear the weight the government would place upon it. At best, this conversation establishes that Jones knew about the crack cocaine at the time of the 8:24 p.m. phone call. It can shine no light on the question of whether Jones agreed to cook crack cocaine eight hours earlier, during the "Sonny" phone call, nor can it be used to infer that Jones cooked crack cocaine inside the South Christiana home.

For these reasons, even viewing the evidence in the light most favorable to the government, the court concludes that certain of the inferences the jury had to draw in order to reach a guilty verdict fall into the realm of impermissible speculation. The evidence introduced at trial was not sufficient to support Jones' conviction as to Count Thirteen or Count Fifteen, and therefore the verdict cannot stand.

## IV. CONCLUSION

Because the guilty verdict returned in this case is not supported by sufficient evidence, the court grants Jones' motion for a judgment of acquittal.


ENTER:


_____
/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 1, 2012